1

2

3

4

5

6

7

# UNITED STATES DISTRICT COURT

8

## EASTERN DISTRICT OF CALIFORNIA

9

10   DALE L. COTTRELL,                           Case No. 1:13-cv-01530-LJO-SAB (PC)

11            Plaintiff,                          FINDINGS AND RECOMMENDATIONS
                                                 RECOMMENDING GRANTING IN PART
12        v.                                     AND DENYING IN PART DEFENDANTS'
                                                 MOTION FOR SUMMARY JUDGMENT
13   FELIX IGBINOSA, et al.,
                                                 (ECF Nos. 78, 85-92, 96)
14            Defendants.
                                                 OBJECTIONS DUE WITHIN THIRTY
15                                               DAYS

16

17        Plaintiff Dale L. Cottrell is appearing pro se and in forma pauperis in this civil rights

18   action pursuant to 42 U.S.C. § 1983.  Currently before the Court is Defendants Berard, Das,

19   Duenas, Igbinosa, Lackey, Ogbuehi, and Park's motion for summary judgment, filed July 25,

20   2016.[1]  (ECF No. 78.)

21                                          I.

22                                     BACKGROUND

23        On September 25, 2010, Plaintiff suffered from a heart attack while he was incarcerated

24   at Pleasant Valley State Prison ("PVSP").  (Second Am. Compl. 12-13,[2] ECF No. 23.)  Plaintiff

25

26   _____
     [1] Defendants provided <u>Rand</u> notice of the requirements to oppose the motion to dismiss in the July 25, 2016 motion.
27   <u>See</u> ECF No. 78-12.

28   [2] All references to pagination of specific documents pertain to those as indicated on the upper right corners via the
     CM/ECF electronic court docketing system.

filed this action on September 23, 2013, alleging deliberate indifference to his need for medical care in violation of the Eighth Amendment.  (ECF No. 1.)  On March 25, 2014, the undersigned screened Plaintiff's complaint and an order issued dismissing the complaint for failure to state a claim.  (ECF No. 10.)  On June 30, 2014, Plaintiff filed a first amended complaint.  (ECF No. 17.)

Plaintiff's first amended complaint was screened on August 1, 2014, and found to state a claim for deliberate indifference to his serious medical needs against Defendants Lackey, Berard, Ogbuehi, Das, Igbinosa, Park, and Duenas.  (ECF No. 20.)  Plaintiff was ordered to either file an amended complaint or notify the Court that he was willing to proceed on the claims found to be cognizable.  (Id. at 7.)  On October 10, 2014, Plaintiff filed a second amended complaint.  (ECF No. 23.)

On October 23, 2014, Plaintiff's second amended complaint was screened and was found to state a cognizable claim against Defendants Berard, Das, Duenas, Igbinosa, Lackey, Ogbuehi, Park and Does 1 through 3, for deliberate indifference to a serious medical need in violation of the Eighth Amendment.  (ECF No. 24.)  Plaintiff submitted service documents on January 5, 2015, and Defendants Berard, Das, Duenas, Igbinosa, and Ogbuehi filed an answer on April 15, 2015.  (ECF No. 35.)  A discovery and scheduling order was filed on April 16, 2016.  (ECF No. 36.)

On July 13, 2015, Defendant Park filed an answer to the second amended complaint; and an order was filed on July 14, 2015, extending the April 16, 2015 discovery and scheduling order to Defendant Park.  (ECF Nos. 44, 45.)  On August 25, 2015, Defendant Lackey filed an answer to the second amended complaint and on August 27, 2015, an order was filed extending the April 16, 2015 discovery and scheduling order to Defendant Lackey.  (ECF Nos. 47, 48.)

On September 10, 2015, Defendants Berard, Das, Duenas, Igbinosa, Lackey, Ogbuehi, and Park filed a motion for summary judgment.  (ECF No. 50.)  After receiving an extension of time, Plaintiff filed an opposition to the motion on February 22, 2016.  (ECF Nos. 64-66.)  After receiving an extension of time, Defendants filed a reply on March 18, 2016.  (ECF No. 75.)  On March 28, 2016, Plaintiff filed a surreply.  (ECF No. 76.)  On July 18, 2016, an order issued

1  dismissing the motion for summary judgment without prejudice for failure to provide Plaintiff

2  with <u>Rand</u> notice.  (ECF No. 77.)

3   On July 25, 2016, Defendants refiled the motion for summary judgment and provided

4  <u>Rand</u> notice to Plaintiff.  (ECF No. 78.)  Plaintiff filed an opposition to Defendants' motion for

5  summary judgment on December 21, 2016.  (ECF Nos. 85-92.)  Defendants filed a reply on

6  January 10, 2017.  (ECF No. 96.)

7  **II.**

8  **SUMMARY JUDGMENT LEGAL STANDARD**

9   Any party may move for summary judgment, and the Court shall grant summary

10  judgment if the movant shows that there is no genuine dispute as to any material fact and the

11  movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks

12  omitted); <u>Washington Mutual Inc. v. U.S.</u>, 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's

13  position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to

14  particular parts of materials in the record, including but not limited to depositions, documents,

15  declarations, or discovery; or (2) showing that the materials cited do not establish the presence or

16  absence of a genuine dispute or that the opposing party cannot produce admissible evidence to

17  support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider

18  other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R.

19  Civ. P. 56(c)(3); <u>Carmen v. San Francisco Unified School Dist.</u>, 237 F.3d 1026, 1031 (9th Cir.

20  2001); <u>accord</u> <u>Simmons v. Navajo County, Ariz.</u>, 609 F.3d 1011, 1017 (9th Cir. 2010).

21   Plaintiff bears the burden of proof at trial, and to prevail on summary judgment, he must

22  affirmatively demonstrate that no reasonable trier of fact could find other than for him.

23  <u>Soremekun v. Thrifty Payless, Inc.</u>, 509 F.3d 978, 984 (9th Cir. 2007).  Defendants do not bear

24  the burden of proof at trial and in moving for summary judgment they need only prove an

25  absence of evidence to support Plaintiff's case.  <u>In re Oracle Corp. Sec. Litig.</u>, 627 F.3d 376, 387

26  (9th Cir. 2010).  If Defendants meet their initial burden, the burden then shifts to Plaintiff "to

27  designate specific facts demonstrating the existence of genuine issues for trial."  <u>In re Oracle</u>

28  <u>Corp.</u>, 627 F.3d at 387 (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)).  This requires

1   Plaintiff to "show more than the mere existence of a scintilla of evidence." In re Oracle Corp.,

2   627 F.3d at 387 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

3   　　　However, in judging the evidence at the summary judgment stage, the Court may not

4   make credibility determinations or weigh conflicting evidence, Soremekun, 509 F.3d at 984

5   (quotation marks and citation omitted), and it must draw all inferences in the light most favorable

6   to the nonmoving party and determine whether a genuine issue of material fact precludes entry of

7   judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936,

8   942 (9th Cir. 2011) (quotation marks and citation omitted).  The Court determines *only* whether

9   there is a genuine issue for trial and in doing so, it must liberally construe Plaintiff's filings

10  because he is a pro se prisoner.  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010)

11  (quotation marks and citations omitted).

12  　　　In arriving at this recommendation, the Court has carefully reviewed and considered all

13  arguments, points and authorities, declarations, exhibits, statements of undisputed facts, and

14  other papers filed by the parties.  Omission of reference to an argument, document, paper, or

15  objection is not to be construed to the effect that this Court did not consider the argument,

16  document, paper, or objection.  This Court thoroughly reviewed and considered the evidence it

17  deemed admissible, material, and appropriate.

18  　　　　　　　　　　　　　　　　**III.**

19  　　　　　　　　　　　　**UNDISPUTED FACTS**

20  　　　1.　　　From before March 2007 to October 2012, Plaintiff Dale Cottrell (P-44493) was a

21  prisoner at PVSP in Coalinga, California.[3]  (Ex. A, M-093, 1792.)

22  　　　2.　　　During the time that Plaintiff was confined at PVSP, Defendants Berard, Duenas,

23  Das, Igbinosa, Lackey, Ogbuehi, and Park were employed by the California Department of

24  Corrections and Rehabilitation (CDCR) at that prison in the following capacities: Igbinosa,

25  Duenas, and Park were Physician-Surgeons, Ogbuehi was a Nurse Practitioner, Das was a

26  

27  [3] Plaintiff responds, "Contrarily, from before December 2003 to October 2012, Plaintiff was a prisoner at PVSP.
    (Plaintiff's Declaration in Opposition to Defendants' Statement of Undisputed Facts 2, ECF No. 87.)  However,
    Plaintiff's statement does not place this fact in dispute.  The Court shall only consider Plaintiff's statements that a

28  dispute exists where such statement actually demonstrate a genuine dispute of the fact.

Physician's Assistant, Berard was a Registered Nurse, and Lackey was a Licensed Vocational Nurse. (Igbinosa Decl. ¶ 3; Duenas Decl. ¶ 3; Park Decl. ¶ 2; Ogbuehi Decl. ¶ 1; Das Decl. ¶ 5; Berard Decl. ¶ 3; Lackey Decl. ¶ 3.)

3.      From early 2007 to the end of 2008, Plaintiff sought and received medical attention on numerous occasions for asthma, allergies, a hernia, eczema and psoriasis, chronic lower-back pain, right-shoulder pain, constipation, and hyperlipidemia.[4] (Ex. A, M-1563, 1567-70, 1572, 1586-88.)

4.      On March 1, 2007, Plaintiff was seen for a consultation with Arturo Palencia, M.D., concerning his complaint of low back pain.  (Ex. A, M-1792-93.)

5.      Dr. Palencia's impression was mechanical low back pain, left sacroillitis, cervical degenerative disc disease, and "rule out cervical facet joint arthropathy."  (Ex. A, M-1793.)

6.      On March 8, 2007, Plaintiff was given a blood test panel that was normal except for a slightly elevated mean cell volume (MCV) and a slightly low reading for red blood cell distribution (RDW).[5]  (Ex. A, M-1742-43.)

7.      On October 18, 2007, after seeing Plaintiff for his psoriasis, Dr. Ehrman, ordered comprehensive blood tests for Plaintiff.  (Ex. A, M-1526, 1568.)

8.      The blood test ordered by Dr. Ehrman showed a borderline-high level of cholesterol and a high level of LDL, although his cardiac risk was within the normal reference range.[6]  (Ex. A, M-1739-40.)

9.      On November 15, 2007, based on Plaintiff's higher-than-normal levels of

---

[4] Plaintiff disputes the statement that he sought treatment for constipation stating the medical record shows otherwise.  While Plaintiff argues that his medical record shows no history of constipation, the record demonstrates that Plaintiff had a history and diagnosis of constipation.  (Exhibit A at M-1570).

[5] Plaintiff disputes that the test results were normal arguing that the elevated MCV and low RDW show abnormal cardiac risk.  As discussed infra at IV.A.2, expert testimony in Federal Court is governed by Federal Rule of Evidence 702.  In order to testify to a medical opinion the witness must demonstrate that he is qualified as an expert by knowledge, skill, experience, training, or education. Fed. R. Evid. 702.  Plaintiff has not demonstrated that he qualifies as a medical expert and cannot opine to a medical opinion.  While Plaintiff identifies lab tests showing he had abnormal results Plaintiff is not qualified to interpret the lab results.  Review of the lab results in question is consistent with the fact as stated.

[6] Plaintiff argues that the lab results indicate a high cardiac risk, however, review of the record demonstrates that it reports results but does not make any conclusions as to Plaintiff's cardiac risk.

cholesterol and LDL, Dr. Ehrman prescribed simvastatin and 81 mg aspirin for Plaintiff.  (Ex. A, M-1533.)

10.     On November 29, 2007, Plaintiff had an EKG that was normal.  (Ex. A, M-1748.)

11.     On March 13, 2008, when seen for his psoriasis and a hyperactive bladder, Plaintiff denied having chest pain and there was no complaint of shortness of breath.  (Ex. A, M-1566.)

12.     On November 14, 2008, another blood test showed that cholesterol/LPL levels, although lower than they were in October 2007, were still borderline high.[7]  (Ex. A, M-1734-35.)

13.     In 2009, Plaintiff was prescribed 81 mg aspirin as a prophylaxis against a heart attack and simvastatin 20 mg daily to lower cholesterol and reduce the risk of a heart attack.  (Ex. A, M-268, 272, 277, 281.)

14.     On April 27, 2009, Plaintiff saw Defendant Das for follow up on Plaintiff's asthma, glaucoma, and allergy, and Plaintiff expressed no complaint of chest pain, shortness of breath, or vomiting.[8]  (Das Decl. ¶¶ 7, 21-22; Ex. A, M-595.)

15.     During Defendant Das's exam of Plaintiff on April 27, 2009, Defendant Das found that Plaintiff's vital signs were normal and his oxygen saturation level (at 100 percent) was excellent; Plaintiff was alert and oriented and in no acute distress, and Defendant Das detected no abnormalities concerning his head, eyes, ears, nose, and throat, no pallor, and no abnormal heart sounds or wheezing.  (Das Decl. ¶ 8; Ex. A, M-595.)

16.     Defendant Das's diagnosis of Plaintiff on April 27, 2009, was that Plaintiff had a mildly persisting asthma and rhinosinusitis (or inflammation of the sinuses), for which Defendant Das refilled Plaintiff's prescription for Benadryl (an allergy medicine).  (Das Decl. ¶ 9; Ex. A, M-595.)

---

[7] While Plaintiff is correct that the record reflects several abnormal results it does not conclude that he was at a high cardiac risk.

[8] Plaintiff states that this record reflects he was "here wc/o asthma", however, Plaintiff misreads the notes within the record.  The record reflects "h/o asthma" and during the examination the notes reflect no chest pain or "SOB".  (HR-042709)-1061.  Further, Plaintiff disputes all undisputed facts on the ground that they do not reflect his previous abnormal heart sounds.  Plaintiff references a January 26, 2009 note in which it states "S1S2 rapid then slow."  HR-(012609)-1133.  However, Plaintiff is not a medical expert and it would require medical testimony to determine the meaning of this note.  Additionally, Defendant Das's facts accurately reflect the findings on the date stated.

17.     Defendant Das saw Plaintiff again on May 26, 2009, for a sore throat and sinus congestion, and Defendant Das prescribed some nasal spray and medications; Defendant Das noted no complaint of chest pain, and Plaintiff expressed no complaint of shortness of breath, nausea, or vomiting, and indicated that his appetite was good.  (Das Decl. ¶¶ 10, 21-22; Ex. A, M-265, 593.)

18.     During Defendant Das's exam of Plaintiff on May 26, 2009, Defendant Das found that Plaintiff's vital signs were normal, and his oxygen saturation level (at 97.1 percent) was excellent, he was alert and oriented and in no acute distress; and, although Plaintiff was mildly congested, Defendant Das detected no abnormalities concerning his head, eyes, ears, nose, and throat, and no abnormal heart sounds or wheezing.  (Das Decl. ¶ 11; Ex. A, M-593.)

19.     Defendant Das's diagnosis of Plaintiff on May 26, 2009, was that Plaintiff had a mild case of sinusitis, a persistent but mild asthma with no recent flare up, and a radicular cervical and lower back pain.  Defendant Das prescribed amoxicillin for Plaintiff's sinusitis and Neurontin for his lower-back pain.  (Das Decl. ¶ 12; Ex. A, M-593.)

20.     Following Defendant Das's examinations of Plaintiff on April 27 and May 26, 2009, Defendant Das did not refer Plaintiff to a cardiologist, or prescribe him any medications to reduce cholesterol or the risk of a heart attack, because nothing Plaintiff told Defendant Das, or that Defendant Das observed in Plaintiff, indicated or suggested that Plaintiff needed to see a cardiologist or take medications to reduce the risk of a heart attack.  (Das Decl. ¶ 18.)

21.     On September 28, 2009, when Plaintiff was seen for a chronic care follow-up concerning his asthma and psoriasis, he had no complaint of chest pain and his exam was normal.  (Ex. A, M-587.)

22.     Plaintiff was seen next on November 17, 2009, for his psoriasis, glaucoma, and cervical neuropathy by a Physician Assistant, who noted Plaintiff's family history of heart attacks and hypertension.[9]  (Barnett Decl. ¶¶ 15, 22; Ex. A, M-583.)

---

[9] Plaintiff contends that he informed Physician's Assistant Wilson that he wanted statin theory and aspirin prescribed.  (ECF No. 87 at 10.)  Plaintiff states that he did not decline statin therapy.  (Id. at 10.)  Plaintiff contends that the record reflects that labs were reviewed because he requested a refill of the statin and aspirin while arguing that he had a history of abnormal blood tests, family history of heart problems, and he had previously been diagnosed with cholesterol high enough to warrant treatment.  (Id. at 11.)  However, Physician's Assistant Wilson is

23.     Blood tests on April 17, 2010, and October 19, 2010, did not indicate a need for cholesterol-lowering drugs.  Nor did blood tests and physical examinations regularly given afterwards support the continued use of aspirin or statin.  (Barnett Decl. ¶ 23; Ex. A, M-554, 559, 560, 563, 1106, 1108, 1165.)

24.     At various times in 2010 and 2011, Defendant Ogbuehi treated Plaintiff concerning many health issues, including asthma, allergies, psoriasis/glaucoma, chronic neck and lower back pain, hyperlipidemia, and chest pain.  (Ogbuehi Decl. ¶ 3; Ex. A, M-466-67, 496-97, 504, 520, 527, 563, 571-72.)

25.     On March 17, 2010, Defendant Ogbuehi saw Plaintiff when he came to the medical line after experiencing sudden chest pain and dizziness that, he stated, had resolved in less than thirty minutes and he was no longer feeling lightheaded.  Plaintiff's main focus concerned a genital issue.[10]  (Ogbuehi Decl. ¶ 4; Ex. A, M-570-71.)

26.     Within a half hour, Plaintiff was given an EKG that was normal.[11]  (Ex. A, M-1165.)

27.     During Defendant Ogbuehi's exam of Plaintiff on March 17, 2010, Plaintiff had no erythema, no murmur, no abdominal mass or tenderness, no chest wall tenderness, his neck range of motion was limited (as usual) but without tenderness.  (Ogbuehi Decl. ¶¶ 5, 7-8; Ex. A, M-570-71.)

28.     Based on Defendant Ogbuehi's examination of Plaintiff and in consultation with Dr. Nyugen, Plaintiff's chest pain was diagnosed as non-cardiac related.  Defendant Ogbuehi

---

not a defendant in this action and therefore, even if Plaintiff did have such a discussion it does not provide notice to the named defendants.

[10] Plaintiff disputes that his chest pain resolved prior to the examination, however the fact does not indicate that chest pain resolved prior to the exam, but that chest pain resolved within thirty minutes and Plaintiff does not dispute the fact as stated.

[11] Plaintiff argues that information of clinical studies are available online that support good cause to appoint an independent medical expert to assist the Court in understanding the evidence to determine the issues of fact. However, as Plaintiff was previously advised in the order denying his motion for appointment of an expert, Rule 706(a) of the Federal Rules of Evidence does not authorize appointment of an expert on a party's behalf.  Hannah v. United States, 523 F.3d 597, 600 (5th Cir. 2008); Conner v. Kirkegard, No. CV1500081HDLCJTJ, 2017 WL 367957, at *2 (D. Mont. Jan. 25, 2017); Watkins v. Baum, No. C11-5494 RBL/KLS, 2012 WL 5328734, at *1 (W.D. Wash. Oct. 29, 2012).  Finally, discovery in this action has closed, the deadline to identify experts has passed, and Plaintiff has not demonstrated that good cause exists to amend the scheduling order. Fed. R. Civ. P. 16(b)(4).

1 advised Plaintiff to return to the clinic if his symptoms of chest pain or dizziness recurred, and

2 scheduled him for a follow-up visit in accordance with Defendant Ogbuehi's custom and

3 practice.[12]  (Ogbuehi Decl. ¶ 6; Ex. A, M-571.)

4      29.     After March 17, 2010, Plaintiff does not appear to have suffered any chest pain

5 symptoms until September 25, 2010.[13]  (Barnett Decl. ¶ 14.)

6      30.     On March 26, 2010, Plaintiff saw Defendant Das for chronic-care follow up of his

7 asthma, psoriasis/glaucoma, and back pain; on that occasion, Plaintiff expressed no complaint of

8 chest pain or shortness of breath.[14]  (Das Decl. ¶¶ 13, 21-22; Ex. A, M-568.)

9      31.     During Das's exam of Cottrell on March 26, 2010, Das found that Cottrell's vital

10 signs were normal and his oxygen saturation excellent, and Defendant Das found no

11 abnormalities of Plaintiff's neck, lungs, heart abdomen, skin, or neuro system; in particular,

12 Defendant Das heard no heart murmur.[15]  (Das Decl. ¶ 14; Ex. A, M-568.)

13      32.     Defendant Das's assessment of Plaintiff on March 26, 2010, was that Plaintiff's

14 health problems—asthma, psoriasis/glaucoma, and chronic lower-back pain—were in fair

15 control and stable; Defendant Das refilled Plaintiff's medications that had been prescribed for

16 these conditions, and Defendant Das ordered a lipids test panel because his review of Plaintiff's

17

---

18 [12] Plaintiff argues that Defendant Ogbuehi was reckless in failing to comply with CDCR policy by not fully
documenting a required CDCR form for chest pain, however, violations of policy in completing the form does not
19 establish a dispute of the fact as stated.

20 [13] In dispute of this fact, Plaintiff cites several records.  Plaintiff cites the 3/17/10 note which is the date Defendant
Ogbuehi saw Plaintiff for chest pain (HR-(031710)-863); notes from 1/26/09 (HR-(111709)-948) and 11/17/09 (HR-
21 (111709)-948) which are outside of the referenced period and do not contain any mention of chest pain; 5/19/10
(HR-(051910)-667) and 7/21/10 (HR-(072110)-631) notes where Plaintiff was seen for neck and or lower back pain
22 which show that cardio was within normal limits; a note from 8/21/10 (HR-(082110)-612-13) which does not
indicate any shortness of breath; and a 3/26/10 ((HR-(032610)-842) note which indicates no chest pain.  The final
23 note referenced is the 9/25/10 visit where Plaintiff was having a heart attack. (HR-(092510)-559.)  None of these
records dispute the fact as stated.

24 [14] Plaintiff states that record for March 26, 2010 noted a discussion with him of labs "with new concerns" which was
25 his chest pain. (ECF No. 87 at 19.)  However, the record for this date states "no new concerns." (HR-(032610)-
842.)

26 [15] Plaintiff disputes this fact declaring that on this date Defendant Das told Plaintiff that he had developed a heart
27 murmur. (ECF No. 87 at 19.)  On its face, a statement that Plaintiff had developed a heart murmur does not create a
dispute of fact that no heart murmur was heard on March 26, 2010.  Plaintiff spends much time arguing that he had
developed a heart murmur, however, Plaintiff has submitted no competent medical evidence to establish what a
28 heart murmur is or that a heart murmur creates a risk of heart attack.

1   recent lab tests showed that his cholesterol/LDL level was high.  (Das Decl. ¶ 15; Ex. A, M-237,

2   568.)

3       33.    A lipid panel is a panel of blood tests that serves as an initial broad medical

4   screening tool for abnormalities in lipids, such as cholesterol and triglycerides.  The results of

5   this test can identify certain genetic diseases and can determine approximate risks for

6   cardiovascular disease and other diseases.  (Barnett Decl. ¶ 17.)

7       34.    In 2009, the conventional approach was to prescribe statins and a low-dose aspirin

8   to patients with some increased risk of heart disease established by the combination of increased

9   age, family history, certain medical conditions (diabetes, high blood pressure) and "bad"

10  cholesterol level (LDL) over 160; having a low level of HDL—the "good" cholesterol—was

11  further reason for treatment.  (Barnett Decl. ¶ 18.)

12      35.    Following Defendant Das's examination of Plaintiff on March 26, 2010,

13  Defendant Das did not refer Plaintiff to a cardiologist or prescribe any medications to reduce the

14  risk of heart attack, because Plaintiff did not complain of any chest pain or shortness of breath, or

15  any other problem associated with a heart condition; and although Defendant Das noted that

16  Cottrell's cholesterol/LDL level was high, Defendant Das wanted to see the result of further lab

17  tests before prescribing any medications to reduce the level.  (Das Decl. ¶ 19.)

18      36.    The lipid test was performed on April 19, 2010, and was normal for cholesterol

19  and within target ranges for LDL, and indicated that the risk for heart attack was low/normal.

20  (Barnett Decl. ¶ 19; Ex. A, M-1108.)

21      37.    On May 12, 2010, Plaintiff sought medical attention to discuss an increase to his

22  baclofen (a muscle relaxant) and Neurontin (an analgesic).  (Ex. A, M-564.)

23      38.    On May 19, 2010, Defendant Ogbuehi saw Plaintiff concerning his request for a

24  refill of his baclofen.  (Ogbuehi Decl. ¶ 9; Ex. A, M-563-64.)

25      39.    When Defendant Ogbuehi saw Plaintiff on May 19, 2010, Plaintiff stated that

26  only baclofen helped his chronic neck spasm and pain and that Neurontin (generically,

27  gabapentin) helped control the occasional numbness in his arms; he had no shortness of breath or

28

asthma attack.[16]   (Ogbuehi Decl. ¶¶ 10, 12; Ex. A, M-553.)

40.     During Defendant Ogbuehi's exam of Plaintiff on May 19, 2010, Defendant Ogbuehi noted tenderness and limited range of motion in Plaintiff's cervical spine, for which Defendant Ogbuehi continued Plaintiff's prescribed Neurontin, but not the baclofen because it was nonformulary and had been discontinued; and Defendant Ogbuehi continued his current medications—Florent and albuterol—for his asthma.  (Ogbuehi Decl. ¶ 11.)

41.     Following Defendant Ogbuehi's exam of Plaintiff on May 19, 2010, Defendant Ogbuehi did not refer Cottrell to a cardiologist, or prescribe any medications to reduce the risk of heart attack, because Plaintiff did not complain of any shortness of breath, or any other problem associated with a heart condition.  (Ogbuehi Decl. ¶ 13.)

42.     On July 17, 2010, Plaintiff sought medical attention for pain in his neck and back that he reported was from "disk and nerve damage."  (Ex. A, M-560.)

43.     Four days later, Defendant Park saw Plaintiff for his neck and back pain.  (Park Decl. ¶ 3; Ex. A, M-559.)

44.     During Defendant Park's exam of Plaintiff on April 21, 2010, Defendant Park reviewed the lipid test results from April 21, 2010, reassured Plaintiff that the lipid results were normal, continued prescribing gabapentin for low back pain, and scheduled Plaintiff's next visit in thirty days.[17]   (Park Decl. ¶ 4; Ex. A, M-559.)

45.     When Defendant Park examined Plaintiff on July 21, 2010, Plaintiff expressed no complaint of chest pain or shortness of breath, and Defendant Park found that Plaintiff was within normal limits in all respects except for the neck and shoulder pain that brought Plaintiff to her.  (Park Decl. ¶¶ 5, 7-8.)

46.     Defendant Park did not refuse to refer Plaintiff to a cardiologist or prescribe anticoagulant medications; Plaintiff did not request a cardiology consultation or anticoagulant medications, and nothing Defendant Park saw and noted from her exam of Plaintiff warranted his

---

[16] Plaintiff states that he complained of ongoing chest pain.  (ECF No. 87 at 25.)

[17] The Court notes that as stated in previous fact, Defendant Park saw Plaintiff on July 21, 2010.

referral to a cardiologist or a prescription for anticoagulant medications.[18]  (Park Decl. ¶ 6.)

47.     On August 21, 2010, Defendant Duenas saw Plaintiff to follow up on his asthma, psoriasis, and elevated lipids.  (Duenas Decl. ¶ 5; Ex. A, M-554.)

48.     When Defendant Duenas examined Plaintiff on August 21, 2010, Plaintiff had no complaint of chest pains or shortness of breath, and his exam was normal.  (Duenas Decl. ¶¶ 6, 11-12; Ex. A, M-554.)

49.     During Defendant Duenas's exam of Plaintiff, she reviewed Plaintiff's lab report from April 17, 2010, showing that his cholesterol level was good, and his LDL level at 121 was near/above optimal.  (Duenas Decl. ¶ 7; Ex. A, M-1108.)

50.     Defendant Duenas found that Plaintiff had good control of his asthma, glaucoma, and lipids, refilled all of Plaintiff's medications, and issued him a chrono for sunglasses. (Duenas Decl. ¶ 8; Ex. A, M- 219-21, 554.)

51.     Plaintiff wanted tramadol for his pain, which Defendant Duenas declined to prescribe in favor of Tylenol because of tramadol's addictive qualities, and tramadol was not indicated for Plaintiff's chronic back pain.  (Duenas Decl. ¶ 9.)

52.     Defendant Duenas did not refuse to either refer Plaintiff to a cardiologist or prescribe anticoagulant medications.  Given that Plaintiff had no chest pain or shortness of breath, his referral to a cardiologist, or a prescription for anticoagulant medications, were not warranted.  (Duenas Decl. ¶ 10.)

53.     On September 9, 2010, Plaintiff sought to renew his baclofen prescription and sought medical attention for his psoriasis and back problems.  (Ex. A, M-552.)

54.     In response, Plaintiff's medical prescription was refilled and he was referred to a medical doctor.  (Ex. A, M-550-51.)

55.     On September 25, 2010, at approximately 8:30 a.m., Defendant Lackey was dispensing medications to inmates on the second floor of Building 4, Facility B, at PVSP.

---

[18] Plaintiff argues that Defendant Park saw Plaintiff three times in contradiction to her declaration.  (ECF No. 87 at 30.)  The record demonstrates that Defendant Park signed off on a medication reconciliation and a note that states "MD line 30 days."  (HR-060210)-658-59.  However there are no notes to indicate that Defendant Park saw Plaintiff on this date.  There is one other note for December 22, 2010, however, since it was after Plaintiff had his heart attack it is irrelevant in this action.  (HR-(122210)-307).

(Lackey Decl. ¶ 5.)

56.     While Defendant Lackey was dispensing medications, an inmate working in the building as a porter told him that an inmate was having chest pain, and he pointed at Plaintiff's cell door to indicate the inmate having the chest pain.  (Lackey Decl. ¶ 12.)

57.     Defendant Lackey went to Plaintiff's cell to inquire about his condition, and Plaintiff told Defendant Lackey that he thought he was having a heart attack because his chest hurt and his father died of a heart attack at age forty-five.  (Lackey Decl. ¶¶ 13-15.)

58.     Defendant Lackey told Defendant Berard of Plaintiff's latest complaint of chest pain and that his father died at forty-five of a heart attack.  (Lackey Decl. ¶ 18.)

59.     An officer hit his alarm to call for an emergency response.  (Lackey Decl. ¶ 19.)

60.     Officers promptly arrived, removed Plaintiff from his cell, placed him on the dayroom floor, and another LVN arrived and began taking his vital signs.  (Lackey Decl. ¶ 20.)

61.     The other LVN asked Defendant Lackey if he had completed dispensing medications, and when Defendant Lackey replied that he had not, stated that she would take care of Plaintiff and that Defendant Lackey should finish distributing medications.  (Lackey Decl. ¶ 21.)

62.     Defendant Berard's first of two encounters with Plaintiff on September 25, 2010, was at approximately 9:00 a.m., in the dayroom of his assigned housing unit.  (Berard Decl. ¶¶ 13-14; Ex. A, M-545-47.)

63.     Defendant Berard, based on her observations, and after conferring with R. Das, the Physician Assistant on call that day, suspected that Plaintiff was suffering from gastroesophageal reflux disease (GERD); and Defendant Das ordered a medication, Mylanta, to treat that condition with the instruction to call the Treatment and Triage Area (TTA) if he did not improve.  (Berard Decl. ¶ 16; Lackey Decl. ¶ 22; Ex. A, M-218, 547-48.)

64.     Pain from a gastrointestinal condition can radiate to the chest, and a GI cocktail is an effective diagnostic tool used to rule out a gastrointestinal problem, if it does not successfully resolve the pain.  (Lackey Decl. ¶ 23.)

65.     Defendant Berard saw Plaintiff again at approximately 9:55 a.m., when Plaintiff

1   appeared at the TTA complaining of no relief from his chest pain.  (Berard Decl. ¶ 17; Ex. A, M-

2   545-46.)

3          66.     Plaintiff had an EKG at 9:55 a.m. which was irregular.  (Ex. A, M-545.)

4          67.     Defendant Berard, again after conferring with Defendant Das, gave Plaintiff

5   oxygen, aspirin, and nitroglycerin, and some blankets because he complained of feeling cold.

6   (Berard Decl. ¶ 18, Ex. A, M-217, 544-46.)

7          68.     At approximately 10:30 a.m., on September 25, 2010, Plaintiff was transferred to

8   a hospital for further treatment.  (Berard Decl. ¶ 19; Ex. A, M-217.)

9          69. On September 25, 2010, Plaintiff was transferred from PVSP's acute care hospital to

10  the Community Regional Medical Center in Fresno, California, where he remained until

11  September 29, 2010.  (Ex. A, M-1467-77.)

12         70.     Examinations of Plaintiff at the Community Regional Medical Center disclosed

13  no heart murmurs or rubs but did disclose a near total occlusion of the left circumflex artery for

14  which a drug-eluting stent was placed.  (Ex. A, M-1470, 1474, 1476.)

15         71.     On October 1, 2010, Defendant Das saw Plaintiff for a complaint of irritation in

16  his right arm.  Plaintiff told Defendant Das that he had a heart condition that required stenting on

17  September 25, 2010.  The right arm irritation he complained of was near the site of the coronary

18  heart disease, near where an intravenous (IV) needle had been placed while he was in the

19  hospital for the stenting.  (Das Decl. ¶ 16; Ex. A, M-540.)

20         72.     During Defendant Das's exam of Plaintiff on October 1, 2010, Plaintiff did not

21  complain of chest or jaw pain, or shortness of breath; Defendant Das diagnosed his arm irritation

22  as possibly due to phlebitis—or inflammation of a vein usually caused from the insertion of an

23  intravenous catheter; and Defendant Das prescribed no medications for the condition prescribed,

24  preferring instead to see if the problem would resolve on its own.[19]  (Das Decl. ¶¶ 17, 21-22; Ex.

25  A, M-540.)

26         73.     Following Defendant Das's examination of Plaintiff on October 1, 2010,

27  _____

28  [19] Plaintiff contends that the pain was in his left arm and he had told Defendant Das that it was possibly caused by
    his handcuffs being overly tight on his return from the hospital after his stent placement.  (ECF No. 87 at 52.)

1  Defendant Das did not refer Plaintiff to a cardiologist or prescribe any medications to reduce the
2  risk of heart attack, because Plaintiff did not complain of any chest pain or shortness of breath, or
3  any other problem associated with a heart condition; and given that he had just been to the
4  hospital for placement of a stent, Defendant Das assumed that he was already being treated for
5  his heart problem.  (Das Decl. ¶¶ 20-22.)

6  74.  During Defendant Igbinosa's tenure as Chief Medical Officer at PVSP from
7  February 2006 to November 2013, he did not examine or treat Plaintiff.  (Igbinosa Decl. ¶¶ 3, 6.)

8  75.  The appearance of Defendant Igbinosa's name on a lab report of a blood test and
9  urinalysis that was routinely given to clear Plaintiff for hernia surgery does not indicate that
10 Defendant Igbinosa ordered the tests or that he was Plaintiff's treating physician at the time.
11 (Igbinosa Decl. ¶¶ 7-9.)

12 76.  Plaintiff was transferred again to the Community Medical Center on October 9,
13 2010, where he remained until October 10, 2010, for additional tests, including a treadmill test.
14 (Ex. A, M-1463-66.)

15 77.  Plaintiff's treadmill test produced "good" results.  (Ex. A, M-1464.)

16 78.  On October 10, 2010, Dr. Rasmussen, Plaintiff's physician at Community
17 Medical Center, prescribed aspirin, statin, and nitroglycerin.  (Ex. A, M-1465.)

18 79.  Lab tests taken on October 19, 2010, showed low levels of cholesterol and LDL.
19 (Ex. A, M-1106-07.)

20 80.  Lab tests taken at the Community Regional Medical Center on October 20, 2010,
21 showed that Plaintiff's cholesterol and LDL levels were within normal ranges, and his
22 cholesterol/HDL ration was slightly below the low end of the range.  (Ex. A, M-1484.)

23 81.  A cardiac stress test given to Plaintiff on June 16, 2011, was negative for angina
24 and ischemia, and his exercise tolerance was described by his examining physician as
25 "excellent."  (Ex. A, M-1427-28.)

26 82.  A chest x-ray on June 16, 2011, showed that Plaintiff's heart was of normal limits
27 of size.  (Ex. A, M-1426.)

28 83.  On June 22, 2011, Defendant Duenas and the Clinical Case Management Review

Committee evaluated Plaintiff for pain management evaluation.  (Ex. A, M-1300-02.)

84.    Defendant Duenas and the committee addressed Plaintiff's complaint of pain in his neck, midback, and lower back, and Plaintiff's request for tramadol to relieve the pain.  (Ex. A, M-1300.)

85.    Defendant Duenas and the committee concluded that Plaintiff's pain could be managed with his current regimen of medications, which did not include tramadol.  (Ex. A, M-1302.)

86.    Defendant Duenas and the committee also noted that Plaintiff "had an excellent stress test [on June 16, 2011] and he tolerated it well;" and that Plaintiff "had no evidence of active ischemia or reversible ischemia on that test."  (Ex. A, M-1300.)

87.    On February 18, 2015, Brian Strunk, M.D., assessed Plaintiff for clearance before neck surgery.  (Ex. A, M-1333-35.)

88.    Plaintiff had no heart symptoms and no significant changes in his EKG other than the old inferior myocardial infarction (MI) from September 2010, his heart rate was normal, his heart sounds were normal, and he had no murmurs.  (Ex. A, M-1333-34.)

89.    Defendant Berard was found to have violated CDCR policy in her initial encounter with Plaintiff on September 25, 2010, by not fully documenting her encounter with Plaintiff, and not bringing him to the TTA for monitoring after he was given the GERD medication.  (Berard Decl. ¶ 20.)

90.    Plaintiff's heart attack on September 25, 2010, was caused by the occlusion of a major blood vessel in his heart that was neither predictable nor preventable.  Nothing in Plaintiff's medical record suggests otherwise.  (Barnett Decl. ¶ 27.)

91.    In 2015, physicians regularly determine the likelihood of a heart attack and the level of treatment to prescribe for a patient according to coronary risk analysis based on the projected number of patients with similar profiles suffering a heart attack within the next ten years.  For a calculated risk below 6-10% there is no established need to prescribe daily aspirin because the rate of complications for such therapy has been found to exceed the benefits.  Using the ten-year Risk Calculator from the National Institutes of Health, Plaintiff's coronary risk on

1  and around March 2010 was 3%.  (Barnett Decl. ¶ 26.)

2    92. Before September 25, 2010, Plaintiff was not overtly at a high risk for a heart

3  attack and there was no reason to believe he suffered with longstanding heart disease.  He did not

4  have high blood pressure, his LDL was within normal range, he was not obese, he was provided

5  in prison with a heart-healthy diet (in compliance with American Heart Association Guidelines),

6  he did not drink or smoke in prison, and he was physically active.  All of these factors reduced

7  his risk of having a heart attack to relatively low levels, and thus provided no indication of a

8  need for prophylactic treatment with drugs.  (Barnett Decl. ¶ 28.)

9    93. There are many causes for chest pain besides heart disease.  To immediately send

10  anyone to the hospital because of chest pain complaint without some evaluation falls below

11  applicable standards of care. Indiscriminate admissions to hospital for all kinds of chest pain

12  would increase the risk of deaths among patients unable to gain prompt access to care in

13  hospitals overcrowded by patients with chest pain highly unlikely to be caused by heart disease.

14  (Barnett Decl. ¶ 29.)

15    94. Even if heart attack is suspected, a distinction is properly made between

16  myocardial infarction (MI) with an EKG showing ST elevation, and the MI with an EKG

17  showing no ST elevation (or non-STEMI) as the treatment for these conditions differ.  In most

18  cases of non-STEMI drug treatments are used without more aggressive or immediate

19  interventions.  (Barnett Decl. ¶ 30.)

20    95. Plaintiff was stable while under care in the prison when he complained of chest

21  pain on September 25, 2010.  He was treated according to protocols for acute coronary

22  syndrome.  Under American Heart Association Guidelines in effect at that time, Plaintiff was

23  timely sent to the acute hospital in stable condition for further care where he was diagnosed as

24  having sustained a non-STEMI.  (Barnett Decl. ¶ 31.)

25    96. On January 9, 2014, Plaintiff was given an exercise stress test that was

26  "nondiagnostic"—or "submaximal" but not necessarily abnormal.  (Barnett Decl. ¶ 32; Ex. A,

27  M-1117, 1121.)

28    97. Defendants did not deny Plaintiff necessary or reasonable treatments that could

have prevented the heart attack he suffered on September 25, 2010, and his claims of permanent irreversible significant injury are exaggerated.  (Barnett Decl. ¶ 10.)

## IV.

## ANALYSIS

### A.    Evidentiary Objections

Plaintiff argues that Dr. Barnett is not a qualified expert to provide testimony in this action because he is not a cardiologist.   Defendants contend that Plaintiff is relying on inadmissible evidence in support of his opposition to the motion for summary judgment.

### 1.    Dr. Barnett is Qualified to Provide an Expert Opinion in this Action

Expert witnesses in federal litigation are governed by Rules 702 to 705 of the Federal Rules of Evidence.   The district court has a gatekeeping obligation to ensure that all expert testimony is reliable and relevant.   Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147, (1999).  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based upon sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.   An expert may testify regarding scientific, technical or other specialized knowledge if it will assist the trier of fact to understand the evidence or to determine a fact in issue.   Daubert v. Merrell Dow Pharm.,Inc., 509 U.S. 579, 589 (1993).

Defendants have proffered the declaration of Bruce P. Barnett, M.D.  (ECF No. 78-2.) Dr. Burnett is the Chief Medical Officer of the California Prison Health Care Services.  (Id. at ¶ 1.)  Dr. Burnett graduated from Harvard Medical School with an M.D. degree in 1975 and completed his residency in Family Practice at the University of California.  (Id. at ¶ 2.)  He has been licensed to practice medicine in California since 1978, is board-certified in Family Medicine, and has more than thirty years of experience in the fields of Family Medicine, Urgent Care, and Emergency Services.  (Id. at 3.)  Based upon the declaration submitted, Dr. Burnett has

established that he has the requisite medical training and experience to qualify as an expert in the field of medicine.   The Court finds that Dr. Barnett is qualified to proffer expert medical testimony in this action.

### 2.    Plaintiff is not Qualified to Proffer a Medical Opinion

In his opposition, Plaintiff points to evidence in the record and gives his opinion of the evidence.   However, as discussed above, in order to testify to a medical opinion the witness must demonstrate that he is qualified as an expert by knowledge, skill, experience, training, or education.   Fed. R. Evid. 702.   Plaintiff has not demonstrated that he qualifies as a medical expert and cannot provide a medical opinion.   Therefore, the Court finds that Plaintiff's opinion regarding his interpretation of medical test results, medical records, and diagnoses are inadmissible in this action.

### 3.    Medical Texts are Not Admissible Evidence

In opposing Defendants' motion for summary judgment, Plaintiff relies on medical texts. For example, Plaintiff submits references to the Harvard Medical School Family Health Guide (ECF No. 87 at 1, 15, 67; ECF No. 88 at 25), MERCK MANUAL of Medical Information (ECF No. 87 at 70; ECF No. 88 at 14, 23), and M.D. Emergency Medicine 3d. ed. (ECF No. 87 at 72). A statement contained in a treatise, periodical, or pamphlet is not hearsay if "the statement is called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination; and the publication is established as a reliable authority by the expert's admission or testimony, by another expert's testimony, or by judicial notice."   Fed. R. Evid. 803(18).

However, "[m]edical articles may only be admitted as substantive evidence if the statement is established to be from a reliable medical authority and is relied upon by a medical expert witness" and "must also be authenticated before it can be admissible."   Combs v. Washington State, No. C12-5280 RBL, 2014 WL 4293960, at *2 (W.D. Wash. Aug. 29, 2014), aff'd sub nom. Combs v. Washington, 660 F. App'x 515 (9th Cir. 2016).   Plaintiff has not established any exception to the hearsay rule for the admissibility of the periodicals, and the Court will not consider Plaintiff's references to medical texts as they are inadmissible hearsay.

1    **B.    Defendants' Motion for Summary Judgment**

2    Defendants Das, Ogbuehi, Park, Duenas, Lackey, Berard, and Igbinosa move for

3    summary judgment on the ground that they did not violate Plaintiff's right to be free from

4    deliberate indifference to his medical needs under the Eighth Amendment to the Constitution of

5    the United States.

6    1.    Applicable Legal Standard

7    While the Eighth Amendment of the United States Constitution entitles Plaintiff to

8    medical care, the Eighth Amendment is violated only when a prison official acts with deliberate

9    indifference to an inmate's serious medical needs.  Snow v. McDaniel, 681 F.3d 978, 985 (9th

10   Cir. 2012), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th

11   Cir. 2014); Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012); Jett v. Penner, 439 F.3d

12   1091, 1096 (9th Cir. 2006).  In order to prevail on his Eighth Amendment claim, Plaintiff must

13   show "(1) a serious medical need by demonstrating that failure to treat [his] condition could

14   result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that

15   "the defendant's response to the need was deliberately indifferent."  Wilhelm, 680 F.3d at 1122

16   (citing Jett, 439 F.3d at 1096).  Deliberate indifference is shown by "(a) a purposeful act or

17   failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the

18   indifference."  Id. (citing Jett, 439 F.3d at 1096).  The requisite state of mind is one of subjective

19   recklessness, which entails more than ordinary lack of due care.  Snow, 681 F.3d at 985 (citation

20   and quotation marks omitted); Wilhelm, 680 F.3d at 1122.[20]

21   "A difference of opinion between a physician and the prisoner - or between medical

22   professionals - concerning what medical care is appropriate does not amount to deliberate

23   indifference."  Snow, 681 F.3d at 987 (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir.

24   1989)); Wilhelm, 680 F.3d at 1122-23 (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir.

25   1986)).  Rather, Plaintiff "must show that the course of treatment the doctors chose was

26   medically unacceptable under the circumstances and that the defendants chose this course in

---

27   [20] Plaintiff relies on cases addressing deliberate indifference in the context of a pretrial detainee's claims under the
     Due Process Clause of the Fourteenth Amendment.  However, Plaintiff is a prisoner and his claims arise under the
28   Cruel and Unusual Punishment Clause of the Eighth Amendment.

conscious disregard of an excessive risk to [his] health." Snow, 681 F.3d at 988 (citing Jackson, 90 F.3d at 332) (internal quotation marks omitted).

> ### 2.    Plaintiff's Heart Disease is a Serious Medical Condition

Deliberate indifference includes "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard— deliberate indifference." Colwell v. Bannister, 763 F.3d 1060, 1066 (9th Cir. 2014) (quoting Snow, 681 F.3d at 985). To meet the objective standard a plaintiff must prove the existence of a serious medical need. Colwell, 763 F.3d at 1066. In this instance, Plaintiff has demonstrated, and Defendants do not dispute, that he has a serious medical need that a reasonable doctor would find important or worthy of comment or treatment. Id.

> ### 3.    Whether Defendants Were Deliberately Indifferent to Plaintiff's Serious Medical Condition

Defendants seek summary judgment in this action arguing that none of them were aware of Plaintiff's heart concerns prior to September 25, 2010, and budget concerns had no bearing on the treatment that Plaintiff received. Plaintiff responds that he did express cardiac concerns and showed a signs that cardiac treatment was needed. Plaintiff further argues that he was deprived of medication and referral to a cardiologist due to the cost of treatment because financial cutbacks were necessary.

At issue in this motion is the subjective component of deliberate indifference. A prison official is deliberately indifferent only if he knew of and disregarded an excessive risk to Plaintiff's health. Colwell, 763 F.3d at 1066. This element focuses on the individual defendant's mental attitude. Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004). To prevail on his Eighth Amendment claim, Plaintiff does not have to prove that he was completely denied of medical care because deliberate indifference can be shown where "prison administrators or physicians denied, delayed, or intentionally interfered" treatment or by the way prison staff delivered medical care. Snow, 681 F.3d at 986.

Ordinary lack of care is insufficient; and "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must

1    also draw the inference."  Farmer v. Brennan, 511 U.S. 825, 835, 837 (1994).  Further, mere

2    indifference, negligence, medical malpractice, and even gross negligence are insufficient to

3    establish deliberate indifference to a serious medical need.  Lemire v. California Dep't of Corr.

4    & Rehab., 726 F.3d 1062, 1082 (9th Cir. 2013).

5        "A difference of opinion between a physician and the prisoner—or between medical

6    professionals—concerning what medical care is appropriate does not amount to deliberate

7    indifference."  Snow, 681 F.3d at 987.  To prove deliberate indifference in such circumstances,

8    Plaintiff "must show that the course of treatment the doctors chose was medically unacceptable

9    under the circumstances" and that Defendants "chose this course in conscious disregard of an

10   excessive risk to plaintiff's health."  Colwell, 763 F.3d at 1068.

11       It is with these standards in mind that the Court evaluates whether there is a genuine issue

12   of material fact as to whether the individual defendants were deliberately indifferent to Plaintiff's

13   serious medical condition.

14       **a.    Defendant Das**

15       In 2007, Plaintiff had a blood test that showed a borderline-high level of cholesterol and a

16   high level of LDL, although his cardiac risk was within the normal reference range.  (Undisputed

17   Fact ("U.F.") 8.)   On November 15, 2007, based on Cottrell's higher-than-normal levels of

18   cholesterol and LDL, Dr. Ehrman prescribed simvastatin and 81 mg aspirin for Plaintiff.  (U.F.

19   9.) On November 14, 2008, another blood test showed that cholesterol/LPL levels, although

20   lower than they were in October 2007, were still borderline high.  (U.F. 12.)  In 2009, Plaintiff

21   was prescribed 81 mg of aspirin as a prophylaxis against a heart attack and simvastatin 20 mg

22   daily to lower cholesterol and reduce the risk of a heart attack.  (U.F. 13.)

23       Defendant Das saw Plaintiff on April 27, 2009.  (U.F. 14.)  Upon examination, Defendant

24   Das found that Plaintiff's vital signs were normal and his oxygen saturation level (at 100

25   percent) was excellent; Plaintiff was alert and oriented and in no acute distress, and Defendant

26   Das detected no abnormalities concerning his head, eyes, ears, nose, and throat, no pallor, and no

27   abnormal heart sounds or wheezing.  (U.F. 15.)  Defendant Das diagnosed Plaintiff with a mildly

28   persisting asthma and rhinosinusitis (or inflammation of the sinuses), for which Defendant Das

1  refilled Plaintiff's prescription for Benadryl (an allergy medicine).  (U.F. 16.)

2      Defendant Das saw Plaintiff again on May 26, 2009.  (U.F. 17.)  During the examination

3  of Plaintiff, Defendant Das found that Plaintiff's vital signs were normal, and his oxygen

4  saturation level (at 97.1 percent) was excellent, he was alert and oriented and in no acute distress;

5  and, although Plaintiff was mildly congested, Defendant Das detected no abnormalities

6  concerning his head, eyes, ears, nose, and throat, and no abnormal heart sounds or wheezing.

7  (U.F. 18.)  Defendant Das diagnosed Plaintiff with a mild case of sinusitis, a persistent but mild

8  asthma with no recent flare up, and a radicular cervical and lower back pain.  Defendant Das

9  prescribed amoxicillin for Plaintiff's sinusitis and Neurontin for his lower-back pain.  (U.F. 19.)

10      Defendant Das saw Plaintiff again on March 26, 2010.  (U.F. 30.)  Plaintiff did not

11  complain of shortness of breath or chest pain.  (U.F. 30.)  Defendant Das ordered a lipids test

12  panel because a review of Plaintiff's recent lab test showed Plaintiff's cholesterol/LDL level was

13  high.  (U.F. 32.)  Defendant Das did not prescribe medication to reduce Plaintiff's cholesterol

14  level because he wanted to see the result of further lab tests.  (U.F. 35.)  The test results were

15  normal for cholesterol and within the normal range for LDL and indicated that Plaintiff's risk for

16  heart attack was low/normal.  (U.F. 36.)

17      Plaintiff contends that when he saw Defendant Das on April 27, 2009, the record notes

18  "here wc/o asthma" and therefore shortness of breath was the complaint.  (ECF No. 6.)  The

19  record as issue appears to state "here h/o asthma."  (HR-(012709)-1061.)  This is consistent with

20  Defendant Das declaration that he saw Plaintiff to follow up on his asthma, glaucoma, and

21  allergies.  (Decl. of R. Das ¶ 7.)  Further, Plaintiff has presented no competent evidence for his

22  statement that asthma and shortness of breath are the same.  Upon examination on April 27,

23  2009, Defendant Das noted no abnormal heart sounds or wheezing.  (Id. at 8.)

24      Plaintiff alleges that he did report a "family history of myocardial infarction (MI) AKA

25  heart attack."  (ECF No. 85 at ¶ 8.)  However, this reference is in a note dated November 17,

26  2009, months after Defendant Das made the decision not to refill Plaintiff's medication.

27      Plaintiff also alleges that Defendant Das ignored the notes from January 26, 2009, in

28  which he reported chest pain and was diagnosed with abnormal heart sounds and high lipid blood

tests.  (ECF No. 87 at 6-7.)  Plaintiff refers to a January 26, 2009 note which notes "some CP off and [with increased] HR [no] SOB".  (HR-(0126909)-1133.)  Upon examination, findings were S1S2 rapid then slow.  (Id.)  The diagnosis included increased lipids in fair control.  (Id.)  Plaintiff has not presented any evidence that Defendant Das was aware of this note and the single reference in Plaintiff's medical records prepared by another medical provider does not demonstrate that Defendant Das was aware on April 27, 2009, that Plaintiff had a cardiac condition requiring referral to a cardiologist or medication.  Plaintiff does not dispute the fact that he did not complain of chest pain or shortness of breath to Defendant Das at this visit.

Plaintiff also references the medical record as evidence that there is a genuine dispute of fact as to whether Defendant Das should have refused to treat a heart condition.  Plaintiff cites a March 9, 2007 and October 30, 2007 report that shows several high hematology results.  (HR-(030807)-1473, HR-(102907)-1295-96.)  However, there is no evidence in the record to interpret such results and they are more than two years prior to the actions of Defendant Das.  Additionally, the October 30, 2007 report indicates that Plaintiff's cardiac risk is within range. (HR-(102907)-1295).  Plaintiff also cites to a normal EKG on November 29, 2007, and a November 15, 2007 record showing he was prescribed Simvastatin.  (HR-(112907)-1273; HR-111507-1281.)

Plaintiff argues that Defendants only cite to two tests that were low while all other tests indicated his cholesterol was high.  The interpretation of medical test results requires specialized education and training, and therefore evidence must come from a medical expert.

According to Dr. Barnett, blood tests on April 17, 2010, and October 19, 2010, did not indicate a need for cholesterol-lowering drugs.  Nor did blood tests and physical examinations regularly given afterwards support the continued use of aspirin or statin.  (U.F. 23.)  Plaintiff seeks to cite to evidence in the record as creating a dispute of fact, but in 2009, the conventional approach was to prescribe statins and a low-dose aspirin to patients with some increased risk of heart disease established by the combination of increased age, family history, certain medical conditions (diabetes, high blood pressure) and "bad" cholesterol level (LDL) over 160; having a low level of HDL—the "good" cholesterol—was further reason for treatment.  (U.F. 34.)

Dr. Barnett opined that Plaintiff was not overtly at a high risk of heart attack and there was no reason to believe he suffered from long standing heart disease.  (Decl. of Bruce P. Barnett, M.D. ¶ 28, ECF No. 78-2.)  Plaintiff did not have high blood pressure, his LDL was within normal range, he was not obese, he was provided in prison with a heart-healthy diet (in compliance with American Heart Association Guidelines), he did not drink or smoke in prison, and he was physically active.  (Id.)  All of these factors reduced his risk of having a heart attack to relatively low levels, and thus provided no indication of a need for prophylactic treatment with drugs.  (Id.)  The medical providers consider multiple factors in determining whether a patient should be proscribed medication and Plaintiff's interpretation of the medical record is insufficient to meet his burden to show a triable issue of material fact in regards to Defendant Daws decision to remove Plaintiff from his statin and aspirin regimen.

When Defendant Das saw Plaintiff again on March 26, 2010, Plaintiff argues that Defendant Das told him that he had developed a heart murmur, but on this date Defendant Das did not hear a heart murmur.  (U.F. 31.)  Further, Dr. Barnett opined that in determining Plaintiff's risk for suffering a heart attack within the next ten years his coronary risk on or around March 2010 was 3 percent.  (Decl. of Bruce P. Barnett, M.D. ¶ 26.)  There is no established need to prescribe daily aspirin therapy where the calculated risk is below 6 to 10 percent because the rate of complications has been found to exceed the benefits.  (Id.)

Plaintiff relies on statements made by Dr. Mouanoutoua during his heart catheterization procedure.  (ECF No. 87 at 67-67.)  A nonmoving party need not produce evidence in a format that would be admissible at trial in support of a motion for summary judgment, Celotex Corp., 477 U.S. at 324, and the court focuses not on the form of the evidence on summary judgment but whether the content of the evidence would be admissible at trial, Fraser v. Goodale, 342 F.3d 1032, 1037 (9th Cir. 2003).  Even if admissible, Dr. Mouanoutoua's statements regarding what he was observing while he was performing Plaintiff's heart catheterization are not sufficient to show that any defendant in this action was aware of Plaintiff's heart disease and failed to properly respond.

Plaintiff alleges that Dr. Mouanoutoua told him that he had a total occlusion of his left

circumflex artery that caused his heart attack.  (ECF No. 87 at 66.)  Dr. Mouanoutoua informed him that earlier cardiac catheterization could have shown the growing lesion and it could have been remedied.  (Id. at 67.)  The issue here is not whether Plaintiff's heart attack could have been prevented by earlier treatment, but whether Defendants were aware that Plaintiff had a serious medical condition and failed to adequately treat the condition.

Plaintiff has failed to meet his burden of establishing that a genuine issue of material fact exists as to whether Defendant Das was deliberately indifferent to his serious medical needs by not refilling his medication or referring Plaintiff to a cardiologist.

**b.     Defendant Ogbuehi**

Plaintiff saw Defendant Ogbuehi when he came to the medical line on March 17, 2010 complaining of sudden chest pain and dizziness.  (Decl. of I. Ogbuehi ¶ 4, Ex. A, M-570-71.) Plaintiff's chest pain had resolved in less than thirty minutes.  (Decl. of I. Ogbuehi ¶ 4, Ex. A, M-571.)  Defendant Ogbuehi examined Plaintiff and found no chest pain, no erythema, no murmur, no abdominal mass or tenderness, no chest wall tenderness, his neck range of motion was limited (as usual) but without tenderness; and his EKG was normal.  (Decl. of I. Ogbuehi ¶ 5, Ex. A, M-571.)  Based on her examination of Plaintiff and in consultation with Dr. Nyugen, who reviewed Plaintiff's EKG, Plaintiff's chest pain was diagnosed as non-cardiac related. (Decl. of I. Ogbuehi ¶ 6, Ex. A, M-571.)  Plaintiff was advised to return to the clinic if his symptoms of chest pain or dizziness recurred, and he was scheduled for a follow-up visit.  (Decl. of I. Ogbuehi ¶ 5, Ex. A, M-571.)

Plaintiff argues that his heart attack indicated that his heart disease was present for many years prior and was a condition serious enough to mandate treatment.  However, it is undisputed that Plaintiff had a serious heart condition.  The question is whether Defendant Ogbuehi was aware of the condition and disregarded it.  Wilhelm, 680 F.3d at 1122.

Plaintiff points to Defendant Ogbuehi's failure to use the required chest pain form during her examination.  The failure to follow procedure itself is not sufficient to establish a violation of the Eighth Amendment.  Peralta, 744 F.3d at 1087.  Plaintiff would need to show that the failure to follow procedure put him at risk and that Defendant actually knew that failing to follow the

procedure would put Plaintiff at risk.  Id.  While Plaintiff argues that using the form would have informed Defendant Ogbuehi of his family history of heart disease, he also argues that he told her of his family history.  Therefore, using the form would not have made a difference under the circumstances he alleges.  Further Plaintiff has not produced evidence to show that Defendant Ogbuehi knew that failing to use the form would put him at risk.

Finally, to the extent that Plaintiff argues that his chest pain was cardiac related and it was misdiagnosed, medical malpractice and even gross negligence are insufficient to establish deliberate indifference to a serious medical need.  Lemire, 726 F.3d at 1082.  In this instance, it is undisputed that Defendant Ogbuehi examined Plaintiff, an EEG was ordered, the EEG results were normal, and Plaintiff was diagnosed with non-cardiac related chest pain.  (Decl. of I. Ogbuehi ¶¶ 5, 6; Ex. A, M-571.)  Plaintiff symptoms resolved with thirty minutes of onset and he was instructed to return if he had any further symptoms and was provided with a follow-up appointment. (Decl. of I. Ogbuehi ¶ 6; Ex. A, M-571.)

Plaintiff saw Defendant Ogbuehi on May 19, 2010 for a refill of his baclofen.  (U.F. 38.) Plaintiff states that he asked Defendant Ogbuehi for cardiac evaluation but she stated his cardiac concern had been documented on March 17, 2010.  (ECF No. 87 at 24.)  Plaintiff also contends that when he asked Defendant Ogbuehi if he was being refused treatment due to budgetary concerns Defendant Ogbuehi "harshly said CDC Title 15 does not require treatment 'unless an inmate has great pain or is dying.'"  (Id.)  However, this response does not demonstrate that Defendant Ogbuehi was aware that Plaintiff was suffering from a serious medical problem and failed to respond.

Plaintiff states that when he informed Defendant Ogbuehi that he complained of ongoing chest pain, Defendant Ogbuehi dismissed his concerns as non-cardiac.  The evidence demonstrates that Defendant Ogbuehi diagnosed Plaintiff with non-cardiac pain and to the extent that Plaintiff was misdiagnosed it does not rise to the level of deliberate indifference.  Plaintiff's lab results showed that his lipids were well controlled and Defendant's expert has testified that this cardiac risk during this period of time was at 3 percent.  (Decl. of Bruce P. Barnett M.D., ¶¶ 23, 26.).

27

Plaintiff argues that Defendant Ogbuehi was wrong in her declaration about Plaintiff having a stent placed because that did not occur until October 25, 2010 and if Defendant Ogbuehi would have referred him to a cardiologist his heart attack would have been prevented. However, construing the facts most favorably to Plaintiff, Defendant Ogbuehi's misdiagnosis of any complained of chest pain as non-cardiac does not rise to the level of deliberate indifference. Lemire, 726 F.3d at 1082.  Plaintiff has failed to meet his burden of establishing that a genuine issue of material fact exists as to whether Defendant Ogbuehi was deliberately indifferent to his serious medical needs by not refilling his medication or referring Plaintiff to a cardiologist.

**c.     Defendant Park**

Defendant Park examined Plaintiff on April 21, 2010.  (U.F. 43.)  Defendant Park reviewed the lipid tests and reassured Plaintiff that his lipid results were normal.  (U.F. 44.) Defendant Park examined Plaintiff and found that Plaintiff was within normal limits in all respects except for the neck and shoulder pain for which she was seeing Plaintiff.  (U.F. 45.)

Plaintiff contends that he discussed his ongoing heart pain from March 17, 2010 and that Defendant Das heard a heart murmur on March 26, 2010.  (ECF No. 87 at 30.)  However, Defendant Park states that she did not request a cardiology consultation or anticoagulant medications because nothing Dr. Park saw and noted from her exam of Plaintiff warranted his referral to a cardiologist or a prescription for anticoagulant medications.  (U.F. 48.)  Further, Defendants expert has testified that Plaintiff's blood test at this visit was normal for cholesterol and his LDL levels were within the target range.  (Decl. of Bruce P. Barnett M.D., ¶ 23.) Plaintiff's calculated risk of heart attack around this time was 3 percent.  (Id. at ¶ 26.)

Plaintiff has failed to meet his burden of establishing that a genuine issue of material fact exists as to whether Defendant Park was deliberately indifferent to his serious medical needs by not refilling his medication or referring Plaintiff to a cardiologist.

**d.     Defendant Duenas**

Plaintiff was seen by Defendant Duenas on August 21, 2010, for follow up on his asthma, psoriasis, and elevated lipids.  (U.F. 47.)  Plaintiff again argues that he discussed his ongoing chest pain from March 17, 2010, and that Defendant Das heard a heart murmur on March 26,

2010.  (ECF No. 87 at 31.)  During Dr. Duenas's exam of Plaintiff, she reviewed his lab report from April 17, 2010, showing that his cholesterol level was good, and his LDL level at 121 was near/above optimal.  (U.F. 49.)  Dr. Duenas found that Cottrell had good control of his asthma, glaucoma, and lipids.  (U.F. 50.)

For the same reasons applicable to the previous defendants, Plaintiff has failed to meet his burden of establishing that a genuine issue of material fact exists as to whether Defendant Duenas was deliberately indifferent to his serious medical needs by not refilling his medication or referring Plaintiff to a cardiologist.

### e.  Lackey

On September 25, 2010, Plaintiff was experiencing sharp chest pain, a burning sensation in his chest, nausea, and something wrong with his arm.  (ECF No. 87 at 34.)  At approximately 8:30 a.m., Defendant Lackey was dispensing medications on the floor.  (U.F. 55.)  Defendant Lackey went to Plaintiff's cell.  (U.F. 57.)  Here, the parties provide conflicting evidence on what occurred next.

Defendant Lackey contends that Plaintiff complained of a burning sensation in his midsection from from his navel to the base of his sternum, and denied that he was experiencing nausea, vomiting, or any other symptoms, and expressed no complaint of chest pain.  (Lackey Decl. ¶¶ 6-7.)  Defendant Lackey states he immediately went downstairs, contacted the TTA, and informed Defendant Berard of Plaintiff's complaints of gastric pain.  (Lackey Decl. ¶ 9.)  Defendant Lackey states that Defendant Berard told him that she would review Plaintiff's medical chart and call him back.  (Lackey Decl. ¶ 10.)  After waiting a few minutes for Defendant Berard's return call, an officer suggested to Defendant Lackey that he proceed with dispensing medications to other inmates in the building and he (the officer) would let Defendant Lackey know when Defendant Berard's return call came.  (Lackey Decl. ¶ 11.)

While Lackey was dispensing medications, an inmate working in the building as a porter told him that an inmate was having chest pain, and he pointed at Plaintiff's cell door to indicate the inmate having the chest pain.  (U.F. 56.)  Defendant Lackey went to Plaintiff's cell to inquire about his condition, and Plaintiff told Defendant Lackey that he thought he was having a heart

1   attack because his chest hurt and his father died of a heart attack at age forty-five.  (U.F. 57.)

2   While Defendant Lackey was speaking to Plaintiff, Defendant Berard returned the call.  ((Lackey

3   Decl. ¶ 16.)  Defendant Lackey told Defendant Berard of Plaintiff's latest complaint of chest

4   pain and that his father died at forty-five of a heart attack.  (Lackey Decl. ¶ 18.)  Officer's arrived

5   to remove Plaintiff from his cell.  (U.F. 60.)

6        However, Plaintiff submits the declarations that tell a different story.  Johnny Fore was

7   Plaintiff's cell mate on September 25, 2010.  (Decl. of Johnny Fore 1, ECF No. 90.)  Inmate Fore

8   states that Plaintiff was not feeling well, and Inmate Fore got the attention of a porter and yelled

9   to him to get Defendant Lackey because his "cellie needs to see him now!"  (Id.)  Defendant

10  Lackey stopped passing out medications and came to the cell door.  (Id.)  Plaintiff got up and

11  told Defendant Lackey that he was having a heart attack.  (Id.)  When Defendant Lackey asked

12  him why he thought he was having a heart attack, Plaintiff explained that his chest hurt really

13  bad and is burning, something was wrong with his arm, he was sick, and he had a family history

14  of heart attacks with many of the men in his family having heart attacks at a young age.  (Id.)

15  Defendant Lackey told Plaintiff he would be back after he finished passing out medications in

16  the building.  (Id.)  Plaintiff laid back down, and Inmate Fore noticed that he looked ashen and

17  Plaintiff said he was not doing too well.  (Id.)  Inmate Fore stated yelling, "Man Down!  Man

18  Down!"  (Id.)  Correctional Officer Monroy came and opened up the cell and the alarm sounded.

19  (Id.)  Several correctional officers came and brought Plaintiff down to the day room floor on a

20  litter.  (Id.)

21       Inmate Andre Wilson was celled next to Plaintiff on September 25, 2010.  (Decl. of

22  Andre Wilson 1, ECF No. 92.)  At approximately 8:10 a.m., he heard Inmate Fore call to

23  Defendant Lackey that his cellie needed medical help.  (Id.)  When Defendant Lackey asked

24  Plaintiff what the problem was, Plaintiff said he was having a heart attack.  (Id.)  Defendant

25  Lackey told Plaintiff he would be back after he finished handing out medications in the building.

26  (Id.)  A few minutes later, Inmate Fore started yelling, "Man Down!  Man Down!"  (Id.)

27  Correctional Officer Monroy came and opened the cell door.  (Id.)  Officer Monroy asked what

28  the problem was and then an emergency alarm activated.  (Id.)  Many correctional officers

1    responded and Plaintiff was taken down to the day room floor on a stretcher.  (Id.)

2        Plaintiff states that Defendant Lackey never came back to the cell after went to finish

3    dispensing medications and that it was Correctional Officer Monroy who responded and

4    activated the alarm while Defendant Lackey was still dispensing medications.  (ECF No. 87 at

5    39.)

6        Plaintiff has submitted evidence to create a genuine issue of material fact as to whether

7    Defendant Lackey was aware that Plaintiff was suffering a serious medical problem and failed to

8    adequately respond by leaving Plaintiff in his cell and continuing to dispense medications after

9    being informed that Plaintiff had chest pain and thought he was having a heart attack.  The Court

10   recommends that Defendant Lackey's motion for summary judgment be denied.

11       **f.    Defendant Berard**

12       In September 2010, Defendant Berard was working as a registered nurse in the TTA at

13   PVSP.  (Decl. of K. Berard ¶¶ 1, 4, ECF No. 78-6.)  Defendant Berard responded on September

14   25, 2010, and saw Plaintiff at approximately 9:00 a.m.in the day room.  (U.F. 62.)  Plaintiff was

15   complaining of chest pain.  (ECF No. 78-6 at ¶ 14.)  Plaintiff was anxious and breathing rapidly,

16   but his pallor appeared normal and he had no shortness of breath or difficulty breathing.  (Id. at ¶

17   15.)  Based upon her observations and, after conferring with Defendant Das, Defendant Berard

18   suspected that Plaintiff was suffering from gastroesophageal reflux disease (GERD).  (Id. at ¶

19   16.)  Defendant Das ordered Mylanta to treat Plaintiff's condition and instructed to call the TTA

20   if Plaintiff did not improve.  (Id.)

21       Defendants argue that the error in treating Plaintiff for GERD instead of a heart attack

22   was unintentional, solitary, and corrected within ninety minutes, and thus does not amount to

23   deliberate indifference.  (ECF No. 78-1 at 15.)  While it is true that an error in diagnosing and

24   treating Plaintiff's condition does not arise to the level of deliberate indifference, Lemire, 726

25   F.3d at 1082, Defendant Berard has testified that Defendant Das told her to treat the condition

26   with the instruction to call the TTA if Plaintiff did not improve.  Defendant Berard has presented

27   no evidence that she or anyone else continued to observe Plaintiff to determine if his condition

28   improved with the proffered treatment.  While Defendant presents evidence that a GI cocktail is

an effective diagnostic tool to rule out gastrointestinal problems if it does not successfully resolve the pain, no one observed Plaintiff after the GI cocktail was administered to determine if it would resolve Plaintiff's pain.

Plaintiff alleges that he told Defendant Berard that he was having a heart attack, felt sharp chest pains, a burning sensation in his chest, nausea, arm pain, dizziness, was blacking out, and sweating.  (ECF No. 87 at 46.)  Plaintiff states that Defendant Berard told him that she did not believe him and asked if he knew how many patients that were taken to the hospital with chest pain only to learn they were having heart burn.  (Id.)  Defendant Berard told Plaintiff she could tell he was not having a heart attack by looking at his skin color.  (Id.)  Further, Plaintiff alleges that after providing him with medication, Defendant Berard instructed all medical responders to abandon Plaintiff on the day room floor.  (Id.)

While the initial misdiagnosis would not be sufficient to arise to the level of deliberate indifference, Defendant Berard cancelled the emergency and all medical personnel left the building.  (Decl. of James Keith 3, ECF No. 91.)  Plaintiff was left on the day room floor unattended (id.), and as a prisoner he could not just call the TTA if his condition did not improve.  As Plaintiff lay on the floor, he called to Officer Monroy who was in the building that something was still wrong.  (Id.)  Officer Monroy responded it's their call not mine.  (Id.) Plaintiff eventually got himself up off the floor and went into the yard where he found an officer on a golf cart to take him to the B-yard clinic.  (ECF No. 87 at 49.)

Defendant Berard contends that when she saw Plaintiff the second time at 9:55 a.m. he was given an EKG, nitroglycerin and aspirin and some blankets because he was feeling cold. (U.F. 65, 67.)  At approximately 10:30 a.m., Plaintiff was transported to a hospital for further treatment.  (U.F. 68.)  Plaintiff was found to have a near total occlusion of the left circumflex artery for which a stent was inserted.  (U.F. 70.)

Dr. Barnett testifies that Plaintiff was stable while under the care in the prison on September 25, 2010, and was treated accordingly to protocols for acute coronary syndrome. (Decl. of Bruce P. Barnett ¶ 31, ECF No. 78-2.)  However, Plaintiff did not receive treatment accordingly to protocols for a heart attack until his second encounter with Defendant Berard.  Dr.

1    Barnett does not address whether the period of time from when Plaintiff first notified prison

2    officials of his heart attack, approximately 8:30 a.m., and when he eventually received treatment

3    for his heart attack, 9:55 a.m., contributed to the damage done by the heart attack.  The record is

4    devoid of any evidence that this one and one half hour delay in treatment was harmless; and

5    Plaintiff has testified that during this time period he was continuing to suffer from the symptoms

6    of the heart attack.

7         Accordingly, Plaintiff has submitted evidence to create a genuine issue of material fact as

8    to whether Defendant Berard was aware that Plaintiff was suffering a serious medical problem

9    and failed to adequately respond by leaving Plaintiff in the day room without any medical

10   monitoring after administrating Mylanta.  Defendant Berard's motion for summary judgment

11   should be denied.

12        **g.    Defendant Igbinosa**

13        Defendants contend that Defendant Igbinosa is not liable in this action because the

14   decision to terminate Plaintiff's medication and not refer him to a cardiologist was based on the

15   medical evidence which indicated that such treatment was not medically necessary and had

16   nothing to do with budgetary constraints.  (ECF No. 78-1 at 14.)  Plaintiff counters that

17   Defendant Das told him on March 26, 2010, that he would not prescribe anticoagulants or refer

18   Plaintiff to a cardiologist and the decision was based largely on a meeting he attended that was

19   conducted by Defendant Igbinosa.  (ECF No. 87 at 53.)  Plaintiff states that Defendant Das told

20   him that Defendant Igbinosa instructed medical personnel not to provide certain preventative

21   treatments because financial cutbacks were necessary due to budget shortfalls.  (Id.)

22        Under section 1983, supervisors may not be held liable for the actions or omissions of

23   their subordinates under the theory of respondeat superior.  Ashcroft v. Iqbal, 5556 U.S. 662, 677

24   (2009); Jones, 297 F.3d at 934.  A supervisor may be held liable only if he is personally involved

25   in the constitutional violation or there is "a sufficient causal connection between the supervisor's

26   wrongful conduct and the constitutional violation."  Snow, 681 F.3d at 989 (quoting Hansen v.

27   Black, 885 F.2d 642, 645–46 (9th Cir.1989)).

28        Plaintiff contends that the record shows that Defendant Igbinosa personally treated him

1   based upon Defendant Igbinosa's name on lab reports.  Further, Plaintiff states he saw Defendant

2   Igbinosa about the 2007 lab results; and Defendant Igbinosa told Plaintiff that he was going to

3   closely monitor his treatment for high cholesterol/LDL.  (ECF No. 87 at 55.)  However, Plaintiff

4   points to no medical record that demonstrates that Defendant Igbinosa personally treated Plaintiff

5   or any record to demonstrate that during the relevant time period Defendant Igbinosa would be

6   aware that Plaintiff needed treatment and refused to act.

7          Defendant Igbinosa, as Chief Medical officer at PVSP, supervised physician-surgeons

8   and other medical clinicians and oversaw the dispensation of healthcare to other patients.  (Decl.

9   of F. Igbinosa ¶¶ 3, 4.)  Defendant Igbinosa did not serve as the primary treating physician for

10  inmates and his name on reports does not indicate that he ordered the tests or that he was the

11  treating physician.  (Id. at ¶¶ 5, 7.)  Defendant Igbinosa's name appeared on reports due to his

12  position as Chief Medical Officer at PVSP.  (Id. at ¶ 9.)  Defendant Igbinosa did not examine or

13  treat Plaintiff during his tenure as Chief Medical Officer at PVSP.  (Id. at ¶ 6.)  There is no

14  evidence in the record, nor has Plaintiff testified that he received treatment from Defendant

15  Igbinosa.  Plaintiff has presented no evidence that Defendant Igbinosa was aware that Plaintiff

16  was at a substantial risk of harm from being removed from his medications or needed to be

17  referred to a cardiologist for a serious heart condition.

18         Plaintiff alleges that Defendant Igbinosa was deliberately indifferent in this action

19  because he instructed medical personnel not to provide certain preventative treatments as a cost

20  savings device.[21]  However, construing such evidence in the light most favorable to Plaintiff, it is

21  insufficient to create a genuine issue of material fact.  Defendants have presented evidence as

22  discussed herein, that the decision to discontinue medication and not refer Plaintiff to a

23  cardiologist was based on his relatively normal blood test results, normal EEGs, and other

24  medical factors that placed him at low risk of heart disease.  (U.F. 91, 92.)

25         Finally, Plaintiff argues that Defendant Igbinosa was aware that there was a policy of

---

[21] Plaintiff references statics contained in Plata Receiver, 563 U.S. (2011) No. 09-1233.  (ECF No. 88 at 12.)  While
judicial notice may be taken "of court filings and other matters of public record[,]" Reyn's Pasta Bella, LLC v. Visa
USA, Inc. 442 F.3d 741, 746 n.6 (9th Cir. 2006), the Court may not take judicial notice of facts contained with the
opinions for the truth of the matter asserted, Wyatt v. Terhune, 315 F.3d 1108, 1114 (9th Cir. 2003) overruled on
other grounds by Albino v. Baca, 747 F.3d 1162 (9th Cir. 2014).

1  denying treatment or medical care for the purpose of saving money based on Defendant Berard's

2  statement that due to the relatively scarce resources for emergencies and urgent situations in the

3  TTA, Defendant Berard found it important to question an inmate about his condition to

4  determine whether admission to the TTA was warranted when she believed the inmate was

5  seeking medical attention in the TTA for reasons other than his actual medical condition.  (Decl.

6  of K. Berard ¶ 11.)  However, the fact that Defendant Berard recognizes the limitations imposed

7  by the resources available and finds it prudent to question inmates who she believes are seeking

8  to gain access to the TTA for reasons other than a medical condition does not create a genuine

9  issue of material fact as to whether Defendant Igbinosa was aware of a policy of denying

10  treatment to save money.

11      Plaintiff has failed to meet his burden of establishing that a genuine issue of material fact

12  exists as to whether Defendant Igbinosa was deliberately indifferent to his serious medical needs.

13  The Court recommends that summary judgment be granted in favor of Defendant Igbinosa.

14      **B.      Qualified Immunity**

15      Defendants argue that they are entitled to qualified immunity because there is no

16  evidence that they disregarded Plaintiff's serious medical condition.  Plaintiff responds that the

17  defendants violated his clearly established rights which a reasonable person would have known

18  and the actions exceeded malpractice.

19      Qualified immunity shields government officials from civil damages unless their conduct

20  violates "clearly established statutory or constitutional rights of which a reasonable person would

21  have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  "Qualified immunity balances

22  two important interests – the need to hold public officials accountable when they exercise power

23  irresponsibly and the need to shield officials from harassment, distraction, and liability when

24  they perform their duties reasonably," Pearson v. Callahan, 555 U.S. 223, 231 (2009), and it

25  protects "all but the plainly incompetent or those who knowingly violate the law," Malley v.

26  Briggs, 475 U.S. 335, 341 (1986).

27      In resolving the claim of qualified immunity, the Court must determine whether, taken in

28  the light most favorable to Plaintiff, Defendants' conduct violated a constitutional right, and if

1   so, whether the right was clearly established. Saucier v. Katz, 533 U.S. 194, 201 (2001); Mueller

2   v. Auker, 576 F.3d 979, 993 (2009). While often beneficial to address in that order, the Court

3   has discretion to address the two-step inquiry in the order it deems most suitable under the

4   circumstances. Pearson, 555 U.S. at 236 (overruling holding in Saucier that the two-step inquiry

5   must be conducted in that order, and the second step is reached only if the court first finds a

6   constitutional violation); Mueller, 576 F.3d at 993-94.

7        In this instance, the Court has found that Defendants Das, Duenas, Igbinosa, Ogbuehi,

8   and Park were not deliberately indifferent to Plaintiff's serious medical need. However, the

9   evidence viewed in the light most favorable to Plaintiff demonstrates there are triable issues of

10  fact as to whether Defendants Lackey and Berard violated his constitutional rights on September

11  25, 2010 by disregarding Plaintiff's complaints that he was having a heart attack. Therefore, the

12  Court proceeds without further discussion to the second step of the inquiry.

13       "For a constitutional right to be clearly established, its contours must be sufficiently clear

14  that a reasonable officer would understand that what he is doing violates that right." Hope v.

15  Pelzer, 536 U.S. 730, 739 (2002). While the reasonableness inquiry may not be undertaken as a

16  broad, general proposition, neither is official action entitled to protection "unless the very action

17  in question has previously been held unlawful." Hope, 536 U. S. at 739. "Specificity only

18  requires that the unlawfulness be apparent under preexisting law," Clement v. Gomez, 298 F.3d

19  898, 906 (9th Cir. 2002) (citation omitted), and prison personnel "can still be on notice that their

20  conduct violates established law even in novel factual circumstances[,]" Hope, 536 U.S. at 741.

21       While an inadvertent failure to provide medical care standing alone does not constitute

22  deliberate indifference to medical needs, Estelle v. Gamble, 429 U.S. 97, 106 (1976); it is clearly

23  established that the failure to act in response to a prisoner's known serious medical need would

24  violate the Eighth Amendment, Jett, 439 F.3d at 1096. Here, both Defendant Lackey and Berard

25  were trained medical personnel. Plaintiff alleges that he complained to both of them that he was

26  having symptoms consistent with a heart attack.

27       There is a triable issue of fact as to whether Defendant Lackey addressed Plaintiff's

28  medical need as he contends or ignored the need stating he would return later as Plaintiff

contends.  It is clearly established that prison personnel would violate the Eighth Amendment by completely ignoring a prisoner's complaint that he was having chest pain and thought he was having a heart attack.  Jett, 439 F.3d at 1096 (deliberate indifference is purposeful failure to respond to prisoner's pain or medical need).

Further, there is a triable issue of fact as to whether Defendant Berard was deliberately indifferent by leaving Plaintiff on the day room floor after giving him Mylanta without any medical supervision to make sure that his symptoms subsided.  It was clearly established at the time of Plaintiff's heart attack that the failure to provide treatment to an inmate while knowing that he was suffering from a serious medical condition would constitute deliberate indifference. Wilhelm, 680 F.3d at 1122  Defendants also argue that Plaintiff's allegation of serious permanent damage to his heart is exaggerated.  It was clearly established that deliberate indifference can be demonstrated by delay in providing treatment for a serious medical condition.  See Meador v. Hammer, No. 2:11-CV-03342 KJM AC, 2015 WL 1238363, at *9 (E.D. Cal. Mar. 16, 2015), report and recommendation adopted, No. 2:11-CV-3342 KJM, 2015 WL 1520307 (E.D. Cal. Mar. 31, 2015) (three hour delay in treating inmate's chest pain sufficient to support deliberate indifference claim); Williams v. Sotelo, 295 F. App'x 208, 209 (9th Cir. 2008) [22] (reasonable jury could conclude that delay in providing medical treatment due to inaction caused plaintiff a constitutional injury).  Here, Plaintiff was suffering from chest pain for an additional hour before finally getting himself to the medical unit for treatment.

The Court finds that Defendants Lackey and Berard are not entitled to qualified immunity in this action.  Defendants Lackey and Berard's motion for summary judgment on this ground should be denied.

**V.**

**CONCLUSION AND RECOMMENDATION**

Based on the foregoing, IT IS HEREBY RECOMMENDED that:

---

[22] Unpublished dispositions and orders of this Court issued on or after January 1, 2007 may be cited to the courts of this circuit in accordance with FRAP 32.1.  Ninth Circuit Rule 36-3(b); see Animal Legal Def. Fund v. Veneman, 490 F.3d 725, 733 (9th Cir. 2007) ("as of January 1, 2007, we must now allow parties to cite even unpublished dispositions and unpublished orders as persuasive authority").

1.     Defendants' motion for summary judgment be GRANTED IN PART AND DENIED IN PART as follows:

a.     Defendants Das, Duenas, Igbinosa, Ogbuehi, and Park's motion for summary judgment be GRANTED; and

b.     Defendants Lackey and Berard's motion for summary judgment be DENIED.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304. Within thirty (30) days of service of this recommendation, any party may file written objections to these findings and recommendations with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   __**February 9, 2017**__

UNITED STATES MAGISTRATE JUDGE